United States District Court
Southern District of Texas
**ENTERED**
November 01, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| GROUND GAME TEXAS, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 7:22-CV-00189 |
| § | |
| CITY OF EDINBURG, TEXAS, *et al.*, § | |
| § | |
| Defendants. § | |

# ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS

Now before the Court is Defendants Clarice Y. Balderas and the City of Edinburg's Motion for Judgment on the Pleadings. (Dkt. No. 25). After considering the Motion, Plaintiff Ground Game Texas's Response, (Dkt. No. 26), and the relevant authorities, the Court is of the opinion that the Motion should be **DENIED** for the reasons stated herein.

## I.     Procedural Background

Plaintiff Ground Game Texas filed the Complaint in this lawsuit on June 6, 2022, against Defendants Clarice Y. Balderas, in her official capacity as the City Secretary of the City of Edinburg, and the City of Edinburg. (Dkt. No. 1). Plaintiff filed its Complaint in the Houston Division of the Southern District of Texas, seeking injunctive and declaratory relief under 28 U.S.C. § 1983, including a temporary restraining order against the City of Edinburg for its refusal to accept an initiative petition. (Dkt. No. 1). Defendants filed a Motion to Change Venue, which was granted. (Dkt. Nos. 12, 16). The case was then transferred to the McAllen Division before this Court. (Dkt. No. 17).

Since then, Defendants have filed an Answer and the instant Motion for Judgment on the Pleadings, (Dkt. Nos. 20, 25), Plaintiff has filed its Response, (Dkt. No. 26), and Defendants have filed a Reply. (Dkt. No. 27).

**II.    Factual Background**

Plaintiff Ground Game Texas is "a nonprofit advocacy organization dedicated to engaging, activating, and mobilizing Texas voters through progressive issue campaigns." (Dkt. No. 1 at 3). Plaintiff is an organization with a statewide focus; it is not local to Edinburg. One of its political strategies is organizing and supporting city-level ballot initiative campaigns on issues such as marijuana decriminalization, local action on climate change, and minimum wage increases, as is at issue here. *Id.* Plaintiff worked with organizations local to Edinburg to develop a petition campaign, intending to submit to Edinburg voters an ordinance that would require the City of Edinburg to pay its employees and contractors at least $15 per hour. *Id.* at 3–4. Plaintiff's plan was to complete Edinburg's petition requirements in time for placement of the ordinance on the November 8, 2022 general election ballot. *Id.*

The City of Edinburg, like many cities in Texas, includes provisions in its charter supporting the right of its residents to initiate local ordinances or charter amendments. Edinburg, Tex. Charter art. XIV, § 1. The Edinburg Charter provides that city voters may present to the City Secretary a petition including signatures of registered voters equal to at least 10% of the turnout in the most recent general election; after the Secretary certifies the signatures, the Edinburg City Council may vote to adopt the ordinance directly. *Id.* § 1–2. If the Council does not, voters may submit an additional petition with signatures equaling 5% of turnout, at which time the City must place the proposed ordinance on the ballot. *Id.* § 4. When voters submit signatures to the City Secretary, the Secretary is required to determine whether the petition, the proposed ordinance, and the signatures comply with the charter. *Id.* art. XVI, § 2.

Additionally, the Edinburg Charter requires that there be a "committee of the petitioner" of five Edinburg voters who "shall be regarded as responsible for the circulation and filing of the petition." *Id.* § 1. As the Court understands it, the City's interpretation of this provision is that it

requires signatures on the petition to be gathered by the five members of the petition committee and forbids signature-gathering by anyone else. *See* (Dkt. No. 25 at 2 (describing how the signature affidavits were rejected because they were not signed by petition committee members)); Edinburg, Tex. Charter art. XVI, § 1 (requiring signature affiants to swear that all signatures were made in the affiant's presence and identifying the affiant as the "circulator").

Plaintiff Ground Game, along with Rio Grande Valley organization LUPE Votes, created a campaign to collect signatures for the $15 minimum wage petition at issue in this case, beginning in January of 2022. (Dkt. No. 1 at 6). Plaintiff and LUPE Votes found Edinburg voters to serve on the petition committee, wrote the proposed ordinance, and hired two professional petition circulators who worked as field organizers for the campaign. *Id.* These professional circulators were not members of the petition committee or registered City of Edinburg voters. *Id.* After collecting almost 900 signatures, Plaintiff submitted its petition to City Secretary Elizabeth Rodriguez on April 14, 2022. *Id.*

Within a month, Secretary Rodriguez notified Plaintiff of her decision not to certify Plaintiff's petition. (Dkt. Nos. 1 at 8, 25, Exh. C). The Secretary's letter identified three deficiencies, two of which Plaintiff cured when it submitted an amended petition on May 13, 2022 as permitted by the Edinburg Charter. (Dkt. Nos. 1 at 8, 25, Exh. C); Edinburg, Tex. Charter, art. XVI, § 3. The only reason for denial of certification that Plaintiff did not cure was the Secretary's determination that the petition did not comply with Article XVI, § 1 of the Edinburg Charter because Plaintiff's petition circulators were not members of the petition committee. (Dkt. Nos. 1 at 8, 25, Exhs. C–D). For that reason, City Secretary Clarice Y. Balderas then rejected Plaintiff's amended petition on May 20, 2022. (Dkt. Nos. 1 at 9, 25, Exh. D (also rejecting the petition on the apparently mistaken belief that the names and addresses of the petition committee were not included in the petition)).

On September 23, 2022, after this lawsuit had been filed and five days before Defendants filed their Motion for Judgment on the Pleadings, Secretary Balderas amended her denial of certification to include her determination that Plaintiff's minimum wage petition was an "appropriation ordinance" that voters could not initiate. (Dkt. No. 25, Exh. E); Edinburg, Tex. Charter, art. XIV, § 1.

### III. Discussion

#### A. Standard of Review

Federal Rule of Civil Procedure 12(c) authorizes judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam)). It is subject to the same standard of review as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6); thus, the central issue is whether, when construed in the light most favorable to the nonmovant, the complaint states a valid claim for relief. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (quoting *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)). To survive a Rule 12(b)(6) motion, the complaint and any other matters properly considered[1] must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The inquiry is not whether the nonmovant will ultimately

---

[1] "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir.2008)); *see also Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (court's review on 12(b)(6) motion "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.").

prevail, but whether it is entitled to offer evidence to support its claim. *Great Plains Trust*, 313 F.3d at 313 (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).

### B. Overview

Defendants make three arguments in favor of judgment on the pleadings. First, they argue that Plaintiff lacks standing as a non-local organization to challenge the denial of the minimum wage petition. Second, Defendants argue that Plaintiff would be unable to receive relief on the constitutional claim because the minimum wage petition is an "appropriation ordinance" that the Edinburg Charter does not permit in voter petitions. Third, they argue that a requirement limiting petition circulators to registered city voters is constitutional.

The Court will address each of these arguments in turn, determining: (1) that Plaintiff does have standing to bring this lawsuit; (2) that an ordinance setting a wage floor is not an "appropriation ordinance" under Texas precedent; and (3) that the requirement is different from how Defendants describe in their Motion, as it limits petition circulators to the five-person petition committee, not just to any registered voters, and Defendants have not shown at this stage that the challenged ordinance is justified by Edinburg's governmental interests.

### C. Ground Game Texas's Standing

Defendants first seek dismissal of this action on the grounds that Plaintiff lacks standing to bring this suit. "Constitutional standing requires that the plaintiff personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts." *Doe v. Tangipahoa Parish School Bd.*, 494 F.3d 494, 496 (5th Cir. 2007). Defendants do not contest the causality or redressability elements of standing, and it is evident from Plaintiff's Complaint that the injury it alleged—the denial of its free speech right to circulate petitions—was caused by Defendants through their enforcement of the Edinburg Charter. That injury may also be

redressed through an order by this Court enjoining enforcement of that provision of the Edinburg Charter.

Defendants do, however, assert that Plaintiff has not showed it has suffered an injury through their refusal to certify the minimum wage petition. In broad terms, Defendants argue that Plaintiff only has an "ideological interest" in the minimum wage petition and that it is not injured by the City Secretary's rejection of the petition. They argue that only a "City employee, a City contractor, or a petition signatory" may be able to challenge Defendants' action. (Dkt. No. 25 at 4). Assuming *arguendo* that these three categories would be the only ones to possess standing to challenge the Secretary's refusal to certify, Defendants correctly point to the Supreme Court's general disfavor for allowing a plaintiff to assert the rights of a third party, the so-called "prudential standing doctrine." *See Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 (5th Cir. 2013) (recognizing that "prudential standing embodies 'judicially self-imposed limits on the exercise of federal jurisdiction'" such as "the general prohibition on a litigant's raising another person's legal rights" (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12 (2004))). They argue that Plaintiff's claims should fail because it may not properly represent the "880 voters of the City of Edinburg who signed the initiative petition at issue." (Dkt. Nos. 1 at 3, 25 at 5).

However, Defendants do not address the fact that Plaintiff is not merely vicariously asserting that the rights of the petition *signatories* were violated when Defendants rejected its petition. Plaintiff is also asserting that its right and the right of its employees to *circulate* petitions has been violated. (Dkt. No. 1 at 10). Plaintiff is thus asserting its own rights under the Constitution and not those of a third party. The Court will therefore consider whether Plaintiff has properly pleaded an injury to its own rights under the First Amendment.

In order to show sufficient injury to confer standing, a "plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Defendants have acknowledged that "Plaintiff has asserted that it has the right to petition, which may be sufficient to show the concreteness requirement is satisfied" while arguing that Plaintiff's injury lacks particularity. (Dkt. No. 25 at 4).

Defendants point to the general rule that "[s]ubjective ideological interests—no matter how deeply felt—are not enough to confer standing." *McMahon v. Fenves*, 323 F. Supp. 3d 874, 879–90 (W.D. Tex. 2018) (citing *Sierra Club v. Morton*, 405 U.S. 727, 729–35 (1972)). While this is true, organizations with specific ideological interests do not have any *greater* standing requirements than the standard rule of injury, causality, and redressability. *See, e.g.*, *Lujan*, 504 U.S. at 560–561 (describing the "irreducible constitutional minimum of standing").

Defendants rely on cases such as *Lujan v. Defenders of Wildlife* and *Sierra Club v. Morton*, where environmental organizations failed to establish standing to challenge government actions on the theory that environmental harm constitutes harm to everyone. *See Lujan*, 504 U.S. at 562 ("Respondents' claimed injury is that lack of consultation with respect to certain funded activities abroad 'increases the rate of extinction of endangered and threatened species."); *Sierra Club*, 405 U.S. at 734–35 (requiring the Sierra Club to allege how it or its members would be directly affected by the challenged action instead of general allegations of aesthetic or ecological impact). But these cases did not prohibit organizations with ideological interests from pursuing litigation when the organizations themselves had suffered an "injury in fact"; rather, they established that disagreement with government action was insufficient to confer standing. *See Sierra Club*, 405 U.S. at 734–35 ("But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.").

In this case, Plaintiff does not assert a vague harm to the rights of Edinburg residents; it asserts an injury to its own right to circulate petitions. (Dkt. No. 1 at 10). "[C]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Hous. Chron. Publ'g Co. v. City of League City, Tex.*, 488 F.3d 613, 618 (5th Cir. 2007). And the Fifth Circuit has recognized that "circulating petitions is speech." *Pool v. City of Houston*, 978 F.3d 307, 311 (5th Cir. 2020) (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186 (1999)). Due to the First Amendment's special protections, plaintiffs may even preemptively challenge speech-infringing laws, so long as they can show they are "seriously interested in disobeying, and the defendant seriously intends on enforcing, the challenged measure." *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (quoting *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 815 (5th Cir. 1979)). Plaintiff need not show this here, as it has already pleaded a "chilling" of its speech through the City of Edinburg's refusal to accept its petition. (Dkt. No. 1 at 10). Aside from the inherent injury to its First Amendment rights, Plaintiff pleaded that it has suffered direct harm from Defendants' actions, as Plaintiff expended financial and organizational resources in supporting its petition campaign, such as hiring two professional petition circulators to work on its campaign. (Dkt. No. 1 at 5–6).

Even if Plaintiff had not expended financial resources, Plaintiff has pleaded that its speech has been chilled, which constitutes an "injury in fact" under Fifth Circuit precedent. *Pool*, 978 F.3d at 311. While Defendants suggest that Plaintiff's only injury is to its "abstract social interests," the fact remains that Plaintiff is directly challenging Defendants' refusal to accept petition signatures gathered by its employees. (Dkt. No. 27 at 3). Plaintiff possesses the same right to political speech—here to circulate petitions—that a private individual does. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) ("The Court has recognized that First Amendment protection extends to corporations.") (collecting cases). The Supreme Court has

"rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Id.* at 343. For these reasons, the Court recognizes that Plaintiff has standing to challenge Defendants' actions.

### D. Edinburg's Prohibition of "Appropriation Ordinances"

The Edinburg Charter contains one other limitation on initiative petitions that is relevant to this case: it forbids the people from initiating an "appropriation ordinance." Edinburg, Tex. Charter, art. XIV, § 1. Defendants contend that Plaintiff's petition is one such appropriation ordinance. (Dkt. No. 25 at 6, Exh. B). If the petition is such an ordinance, then this Court could dismiss the case without considering Plaintiff's constitutional claim, as Plaintiff would not be able to obtain relief regardless. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (quoting *Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984))).

In Plaintiff's ordinance, the first provision would adopt a new city policy "to establish a wage floor of $15.00 per hour for City employees and persons paid under City contracts." (Dkt. No. 25, Exh. B § 30.100). The remaining provisions concern implementation of that wage floor, such as requiring the City Manager to ensure the annual budget is created with payment of at least $15.00 per hour in mind and requiring the city to only work with contractors and subcontractors that pay workers at least $15.00 per hour on city contracts. *Id.* § 30.101–05.

The parties differ as to the definition of the phrase "appropriation ordinance." (Dkt. Nos. 25 at 6, 26 at 7–9). Defendants argue that Plaintiff's petition should be barred because "it asks for an ordinance concerning appropriations." (Dkt. No. 25 at 6). Defendants define "appropriation

ordinance" as "a measure . . . authorizing the expenditure of public monies and stipulating the amount, manner, and purpose of the various items of expenditure." *Id.* (quoting *Appropriation Bill*, Black's Law Dictionary (5th ed. 1979)).[2] Plaintiff suggests that "'appropriation' means one thing: a vote by a legislative body to authorize the expenditure of funds." (Dkt. No. 26 at 6). The Court declines to adopt either of these definitions in full, instead understanding the word "appropriation" to require some specific allocation of money rather than referring to any act that would affect government finances. This understanding is supported by the relevant judicial precedent.

Interpretation of a city charter is a matter of state law, and in "Texas, 'courts construe city charter provisions according to the rules governing statutory interpretation.'" *Kueber v. City of San Antonio*, 197 F. Supp. 3d 917, 927 (W.D. Tex. 2016) (quoting *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 463 (N.D. Tex. 2012)). In the Fifth Circuit, this Court must "follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute." *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007); *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012) ("The plain language of a statute is the surest guide to the Legislature's intent."). The Texas Supreme Court instructs that, in the absence of "definitions prescribed by the Legislature," courts should "construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context." *City of Rockwell v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008) (citation omitted).

The issue before the Court, then, is determining the specificity of the phrase "appropriation ordinance," drawing from its plain meaning. If the phrase refers to any ordinance related to monetary disbursements by the City of Edinburg, then it is likely that Plaintiff's petition is

---

[2] The current edition of Black's Law Dictionary defines an "appropriation" as "[a] legislative body's or business's act of setting aside a sum of money for a specific purpose" and an "appropriations bill" as "[a] bill that authorizes governmental expenditures." *Appropriation*, Black's Law Dictionary (11th ed. 2019); *Appropriations bill*, Black's Law Dictionary (11th ed. 2019)

included. If, however, the phrase refers instead to ordinances that specifically designate funds and require the City to spend those funds in a particular manner, then Plaintiff's petition is likely not included in the definition, as it does not expressly require the City to make any additional expenditures at all. (*See* Dkt. No. 25, Exh. B).

Interestingly, this is not the first time that Texas courts have been faced with the question of a minimum wage petition in a city that forbids appropriation petitions. In 1937, the Texas Supreme Court examined two ballot initiatives in Houston fixing minimum salaries: one for fire department employees and one for other city employees. *Taxpayers' Ass'n of Harris Cnty v. City of Houston*, 105 S.W.2d 655 (Tex. 1937). The local Taxpayers' Association challenged the initiatives on multiple grounds, including that the Houston City Charter required City Controller certification before the city could pass any "ordinance, resolution or order for the appropriation of money, or for the making of any contract, agreement or other obligation requiring the expenditure of money." *Id.* at 636; Houston, Tex. Charter art. II, § 19a (largely the same today). Affirming the judgments below, the Texas Supreme Court held that the "'contract, agreement or other obligation' referred to in the above charter provision has no remote reference to ordinances such as these, which merely express public policy of the city by stipulating minimum salaries and wages for city officers and employees." *Taxpayers*, 105 S.W.2d at 637.

The *Taxpayers* Court rejected the idea that the city government could reserve all fiscal powers for itself, holding that the people still retained the right to "express public policy." *Id.* There, the Court interpreted the "appropriation" in the City Charter to be closer to a "contract, agreement or other obligation" than to a policy decision. *Id.* Indeed, the Texas Supreme Court still instructs courts, when interpreting the power of the popular initiative in a particular city's charter, that "because the people's initiative and referendum power is reserved, not granted, to them, 'such charter provisions should be liberally construed in favor of the power reserved.'" *Brown v. Todd*,

53 S.W.3d 297, 303 (Tex. 2001) (quoting *Taxpayers*, 105 S.W.2d at 657). This history generally suggests that the phrase "appropriation ordinance" in the Charter should be interpreted with some specificity to avoid unduly limiting the ability of the people to petition for policy changes.

This Court believes that the petition at issue here is substantially similar to the ones in *Taxpayers*, and it is inclined to follow the precedent set by the Texas Supreme Court, without establishing a concrete definition of the word "appropriation." It is sufficient to determine that an "appropriation ordinance" requires some specific allocation of money, rather than any policy changes that may have the effect of requiring the city to spend money. This precedent establishes that the people may not be able to demand that the city build a new football stadium, but the people can demand that the city adopt a policy to pay the workers who might be employed to build it at least $15 per hour.

### E. The First Amendment Issue

The Court now turns to the core constitutional issue. Plaintiff pleads that the City of Edinburg's restrictions on petition circulators violate the First Amendment. Defendants counter that the restrictions are reasonable restraints that help to protect their interests in limiting petitions to "truly local grassroots efforts" from city residents. The Court finds that Plaintiff has sufficiently pleaded an injury under the First Amendment that Defendants cannot show at this time is justified by their interests.

It will be most helpful to begin with examining what the Edinburg Charter requires of petition circulators. Article XVI, Section 1 of the Charter requires that, when petitioners submit signatures to the City Secretary, each page of signatures have "attached an affidavit of the circulator thereof." Edinburg, Tex. Charter, art. XVI, § 1. It also requires that the petition include the "names and addresses of five (5) voters of the city . . . who, as a committee of the petitioner, shall be regarded as responsible for the circulation and filing of the petition." *Id.* Finally, it includes

the text of the affidavit necessary to confirm signatures, where the affiant must swear that "he/she, and he/she only, personally circulated the foregoing paper, [and] that all the signatures appended thereto were made in his/her presence." *Id.*

While the meaning of the phrase "responsible for the circulation and filing of the petition" is not immediately clear, Defendants rejected Plaintiff's petition because "the names of the people signing the affidavits did not match any of the names of the five voters of the City listed on the 214 pages of the petition." (Dkt. No. 25, Exh. D). The City's petition system at issue, therefore, can be expressed as three requirements: (1) there must be a five-member petition committee; (2) those five members must be registered voters of Edinburg; and (3) no one other than the five members may circulate the petition for signatures.

Plaintiffs do not challenge Edinburg's requirement that there exist a "committee of the petition" composed of registered city voters. (*See* Dkt. No. 1). Solely at issue is Defendants' refusal to allow petitions circulated by non-members of the petition committee.

Defendants in their Motion or in their Reply do not expressly defend the City's five-circulator limitation. (*See* Dkt. Nos. 25, 27). Instead, Defendants more generally defend the idea that a city may validly limit petition circulators to registered city voters. (Dkt. No. 25 at 8–9). At the outset, there is merit to Plaintiff's claim that such a regulation has already been determined to be unconstitutional. *See Pool*, 978 F.3d at 309 ("[The Houston] Charter allows only registered voters to circulate petitions for initiatives and referenda, even though the Supreme Court held a similar law unconstitutional twenty years ago." (citing *Buckley*, 525 U.S. at 193–97)). But that is not the requirement of the Charter as implemented by Defendants.

The Edinburg Charter requires that the five-member petition committee be "responsible" for circulating the petition, and separately it requires that those five members be registered Edinburg voters. Edinburg, Tex. Charter, art. XVI, § 1. Defendants have interpreted this to mean

that those five members must circulate the petition, thus effectively requiring circulators to be registered voters. Because the Charter's requirement is not a mere registration requirement for circulators, the Court will not examine whether such a requirement would be constitutional in Edinburg. It is not even clear that the Charter, if the five-member limitation were struck down, would still require circulators to be registered voters. *See id.* (placing "responsibility" for circulating the petition on the committee but not setting registration requirements for *circulators*). The Court will instead examine whether Edinburg's requirement that circulators be limited to the five-member petition committee is constitutional, determining that Defendants cannot show at this stage that it is.

There is considerable tension in the realm of voting and political speech between private rights and government regulation. The Supreme Court has recognized that petition circulation "is 'core political speech' because it involves 'interactive communication concerning political change.'" *Buckley*, 525 U.S. at 186 (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)). "First Amendment protection for such interaction . . . is 'at its zenith.'" *Id.* (quoting *Meyer*, 486 U.S. at 425). In spite of, or perhaps because of, the importance of First Amendment rights in the voting context, the Supreme Court has also noted that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

"Most constitutional analyses of a statute begin with an examination of the degree of scrutiny a statute will receive." *Voting for America, Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012). There are many different levels of scrutiny and election regulations have historically warranted a "more flexible standard" than strict or intermediate scrutiny, as courts recognize the need for governments to implement rules for conducting fair and efficient elections. *See Burdick v. Takushi*, 503 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788–89

(1983)). Courts considering an election law's constitutionality must weigh "the character and magnitude of the asserted injury" to First Amendment rights against "the precise interests put forward by the State as justifications for the burden." *Anderson*, 460 U.S. at 789. The Supreme Court has also characterized this inquiry as asking whether "the restrictions in question significantly inhibit communication with voters about proposed political change [] and are not warranted by the state interests . . . alleged to justify those restrictions." *Buckley*, 525 U.S. at 192. There is "no litmus-paper test for separating those restrictions that are valid from those that are invidious," and there "is no substitute for the hard judgments that must be made." *Storer*, 415 U.S. at 730.

Ultimately, the additional flexibility given to governments in the election context may not be separate from strict scrutiny but rather may be a function of the strong interests local and state governments have in regulating elections. The modern Supreme Court elections decisions are "in keeping with the 'now-settled approach' that state regulations 'impos[ing] "severe burdens" on speech . . . [must] be narrowly tailored to serve a compelling state interest.'" *Buckley*, 525 U.S. at 192 n.12 (quoting *id.* at 206 (Thomas, J. concurring)) (alterations in original).

As an initial determination, it is probable that Edinburg's five-person circulator restriction "significantly inhibits communication with voters about proposed political change" and is therefore a "severe burden." *Id.* at 192 & n.12. Defendants forbid anyone outside of the petition committee from gathering signatures, limiting the reach and enthusiasm that any particular petition may generate and "directly burdening the one-on-one, communicative aspect of petition circulation." *Id.* at 215 (Thomas, J. concurring). The Court need not conclude at this stage that the five-circulator restriction is a "severe burden," but Plaintiff has sufficiently alleged a significant limitation on speech.

Separately, the Court must consider whether that significant inhibition of communication is "warranted by [Edinburg's] interests." *Id.* at 192. Defendants phrase their interests in this way:

> The City of Edinburg requires that Edinburg voters circulate an initiative petition pursuant to Article XIV of the City Charter to protect small government and local control, ensuring that initiatives are truly local grassroots efforts for benefit of the residents of the City of Edinburg and not outsider attempts to impose ideals and policies that are either foreign to the locality or that are simply ill-advised for residents. The requirement that those circulating the petition also be registered voters ensures or allows the City to confirm that the individuals are truly Edinburg residents.

(Dkt. No. 25 at 8). Encouraging local initiatives and grassroots efforts is certainly a proper interest. It is not clear at this time, however, that *excluding* the interests of nonresidents is proper. Defendants have asserted that these interests sufficiently outweigh a registration requirement for petition circulators, but, as discussed above, that is not the issue. (Dkt. No. 25 at 8–9).

Regardless, there are substantial questions as to whether these interests are sufficiently compelling and whether Edinburg's restriction is narrowly tailored to serve those interests. Defendants do not provide justification for why the same values of grassroots organizing and local control cannot be served by its unchallenged requirement that all *signatories* of the petition be "voters of the city." Edinburg, Tex. Charter, art. XIV, § 1. The "petition committee" seems to be a creative method of indicating which Edinburg citizens are most supportive of the petition, but it is difficult to see the benefit of restricting circulators to only those five members. Election rights are strongly protected by the Constitution and binding precedent, and this Court must examine all of Defendants' options in furthering its interests prior to accepting their decision to limit those rights. *See Buckley*, 525 U.S. at 205 (affirming how the lower court "correctly separated necessary or proper ballot-access controls from restrictions that unjustifiably inhibit the circulation of ballot-initiative petitions). For this reason, judgment on the pleadings is not appropriate.

The Court cannot determine, as a matter of law at this stage of the litigation, that Defendants' interests outweigh the significant inhibition of speech that Edinburg's requirement of

16 / 17

no more than five petition circulators imposes. The Court also declines to decide whether these interests would outweigh a registration requirement for circulators.

### IV.    Conclusion

For the foregoing reasons, the Court determines that Defendants Clarice Y. Balderas and the City of Edinburg are not entitled to judgment on the pleadings.

It is, therefore, **ORDERED** that Defendants' Motion for Judgment on the Pleadings is **DENIED**.

SO ORDERED November 1, 2022, at McAllen, Texas.

_____
Randy Crane
United States District Judge