United States District Court
Southern District of Texas
**ENTERED**
March 09, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

GROUND GAME TEXAS,        §
       §
      Plaintiff,        §
       §
VS.        §    CIVIL ACTION NO. 7:22-CV-00189
       §
CITY OF EDINBURG, TEXAS, *et al.*,        §
       §
      Defendants.        §

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Now before the Court are Plaintiff Ground Game Texas's Motion for Summary Judgment, (Dkt. No. 28), and Defendants Clarice Y. Balderas and the City of Edinburg's Response and Cross-Motion for Summary Judgment, (Dkt. No. 32). After considering the Motions, Plaintiff's Reply and Response, (Dkt. No. 34), and the relevant law, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendants' Motion for Summary Judgment.

### I.     Procedural Background

Plaintiff Ground Game Texas filed the Complaint in this lawsuit on June 6, 2022, against Defendants Clarice Y. Balderas, in her official capacity as the City Secretary of the City of Edinburg, and the City of Edinburg. (Dkt. No. 1). Plaintiff filed its Complaint in the Houston Division of the Southern District of Texas, seeking injunctive and declaratory relief under 28 U.S.C. § 1983, including a temporary restraining order against the City of Edinburg for its refusal to accept an initiative petition. *Id.* Defendants filed a Motion to Change Venue, which was granted. (Dkt. Nos. 12, 16). The case was then transferred to the McAllen Division before this Court. (Dkt. No. 17).

Defendants filed a Motion for Judgment on the Pleadings on September 28, 2022. (Dkt. No. 25). Prior to the Court's ruling on the Motion, Plaintiff filed its Motion for Summary Judgment

on October 31, 2022. (Dkt. No. 28). The Court denied Defendant's Motion for Judgment on the Pleadings the following day. (Dkt. No. 29). Defendants filed their Response and Cross-Motion for Summary Judgment on November 23, 2022. (Dkt. No 32). Plaintiff filed its Reply and Response on December 14, 2022. (Dkt. No. 34).

## II.      Factual Background

Plaintiff Ground Game Texas is "a nonprofit advocacy organization dedicated to engaging, activating, and mobilizing Texas voters through progressive issue campaigns." (Dkt. No. 1 at 3). Plaintiff is an organization with a statewide focus; it is not local to Edinburg. One of its political strategies is organizing and supporting city-level ballot initiative campaigns on issues such as marijuana decriminalization, local action on climate change, and minimum wage increases, as is at issue here. *Id.* Plaintiff worked with organizations local to Edinburg to develop a petition campaign, intending to submit to Edinburg voters an ordinance that would require the City of Edinburg to pay its employees and contractors at least $15 per hour. *Id.* at 3–4. Plaintiff's plan was to complete Edinburg's petition requirements in time for placement of the ordinance on the November 8, 2022 general election ballot. *Id.*

The City of Edinburg, like many cities in Texas, includes provisions in its charter supporting the right of its residents to initiate local ordinances or charter amendments. Edinburg, Tex. Charter, art. XIV, § 1. The Edinburg Charter provides that city voters may present to the City Secretary a petition including signatures of registered voters equal to at least 10% of the turnout in the most recent general election; after the Secretary certifies the signatures, the Edinburg City Council may vote to adopt the ordinance directly. *Id.* § 1–2. If the Council does not, voters may submit an additional petition with signatures equaling 5% of turnout, at which time the City must place the proposed ordinance on the ballot. *Id.* § 4. When voters submit signatures to the City

Secretary, the Secretary is required to determine whether the petition, the proposed ordinance, and the signatures comply with the charter. *Id.* art. XVI, § 2.

Additionally, the Edinburg Charter requires that there be a "committee of the petitioner" of five registered Edinburg voters who "shall be regarded as responsible for the circulation and filing of the petition." *Id.* § 1. "It is the City's position that only those in the committee may serve as circulators," meaning that the Charter, as applied by the City, requires signatures on the petition to be gathered by the five members of the petition committee and forbids signature-gathering by anyone else. (Dkt. No. 32 at 3); Edinburg, Tex. Charter, art. XVI, § 1.

Plaintiff Ground Game, along with Rio Grande Valley organization LUPE Votes, created a campaign to collect signatures for the $15 minimum wage petition at issue in this case, beginning in January of 2022. (Dkt. No. 1 at 6). Plaintiff and LUPE Votes found Edinburg voters to serve on the petition committee, wrote the proposed ordinance, and hired two professional petition circulators who worked as field organizers for the campaign. *Id.* These professional circulators were not members of the petition committee or registered City of Edinburg voters. *Id.* After collecting almost 900 signatures, Plaintiff submitted its petition to City Secretary Elizabeth Rodriguez on April 14, 2022. *Id.*

Within a month, Secretary Rodriguez notified Plaintiff of her decision not to certify Plaintiff's petition. (Dkt. Nos. 1 at 8, 25, Exh. C). The Secretary's letter identified three deficiencies, two of which Plaintiff cured when it submitted an amended petition on May 13, 2022 as permitted by the Edinburg Charter. (Dkt. Nos. 1 at 8, 25, Exh. C); Edinburg, Tex. Charter, art. XVI, § 3. The only reason for denial of certification that Plaintiff did not cure was the Secretary's determination that the petition did not comply with Article XVI, § 1 of the Edinburg Charter because Plaintiff's petition circulators were not members of the petition committee. (Dkt. Nos. 1 at 8, 25, Exhs. C–D). For that reason, City Secretary Clarice Y. Balderas rejected Plaintiff's

amended petition on May 20, 2022. (Dkt. Nos. 1 at 9, 25, Exh. D (also rejecting the petition on the apparently mistaken belief that the names and addresses of the petition committee were not included in the petition)).

On September 23, 2022, after this lawsuit had been filed and five days before Defendants filed their Motion for Judgment on the Pleadings, Secretary Balderas issued a notice to Plaintiff stating that she had amended her denial of certification to include her determination that Plaintiff's minimum wage petition was an "appropriation ordinance" that voters could not initiate. (Dkt. No. 25, Exh. E); Edinburg, Tex. Charter, art. XIV, § 1.

## III.   Discussion

### A.  Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and it is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed R. Civ. P. 56(a), (c).

Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; Fed R. Civ. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

### B. Overview

The central issue of this case is whether the City of Edinburg's petition-committee system for petition circulation is unconstitutional under the First Amendment. Specifically, the Court will address the requirements that petition circulators be limited to five individuals and that all circulators be registered voters. The Court finds both requirements unconstitutional as applied by Defendants. Defendants additionally allege a residency requirement in the Charter, but the Court finds no textual support in the Charter for a residency requirement and therefore declines to address its constitutionality.

Defendant's Motion also raises the argument that Plaintiff's petition is an "appropriation ordinance" that is impermissible under the Edinburg Charter. (Dkt. No. 32 at 8). The Court has previously determined that Plaintiff's petition is not an "appropriation" under Texas law, (Dkt. No. 29 at 12), so it will briefly restate its reasons after discussing the First Amendment issue.

### C. Constitutionality of Edinburg's Petition Circulator Restrictions

The Court will again begin with examining what the Edinburg Charter requires of petition circulators. Article XVI, Section 1 of the Charter requires that the petition include the "names and addresses of five (5) voters of the city . . . who, as a committee of the petitioner, shall be regarded as responsible for the circulation and filing of the petition." Edinburg, Tex. Charter, art. XVI, § 1.

It also requires that, when petitioners submit signatures to the City Secretary, each page of signatures have "attached an affidavit of the circulator thereof." *Id.* Finally, it includes the text of the affidavit necessary to confirm signatures, where the affiant must swear that "he/she, and he/she only, personally circulated the foregoing paper, [and] that all the signatures appended thereto were made in his/her presence." *Id.*

While the meaning of the phrase "responsible for the circulation and filing of the petition" is not immediately clear, Defendants rejected Plaintiff's petition because "the names of the people signing the affidavits did not match any of the names of the five voters of the City listed on the 214 pages of the petition." (Dkt. No. 25, Exh. D). The City's petition system at issue, therefore, can be expressed as three requirements: (1) there must be a five-member petition committee; (2) only petition-committee members may circulate the petition for signatures; and (3) all circulators must be registered voters of Edinburg. Plaintiff does not challenge the first requirement, that a committee of Edinburg voters be "responsible" for each petition, only that that responsibility should not be interpreted to mean that only the committee may circulate the petition. The Court believes that a plain reading of the Charter does not require exclusion of non-members of the committee from circulation. Responsibility may include any number of other duties, such as answering questions from the City regarding the petition and overseeing the signature gathering process. However, because "[i]t is the City's position that only those in the committee may serve as circulators," the Court must determine whether the Edinburg Charter, as applied by Defendants, is unconstitutional under the First Amendment because it limits who may circulate petitions. (Dkt. No. 32 at 2–3).

Defendants characterize the requirements slightly differently. Defendants refer to the petition-committee system in the Charter as a "residence requirement." (Dkt. No. 32 at 3). Essentially, Defendants argument has two prongs. First, that it is constitutional for a city to require

that its petition circulators be residents, and second, that it is constitutional to use both the voter registration requirement and the five-person limitation as a mechanism for *verifying* residency. (Dkt. No. 32 at 3–6). The Court understands Defendants' brief to include this defense of the five-person limitation, though the only express argument Defendants make in support of the five-person limitation is that it is not burdensome because Plaintiff was able to collect enough signatures with only four circulators. (Dkt. No. 32 at 3).

Regardless of whether the Charter as-applied constitutes a "residence requirement," a "registration requirement," or a "committee requirement," the effect is the same. The City of Edinburg prohibits signature-gathering by anyone other than a five-person committee of registered voters.

The Court will discuss the relevant standard for a claim alleging unconstitutional limitations on petition circulation before applying it to the system at issue. The Court will then analyze the constitutionality of Edinburg's requirements, beginning with the five-circulator limitation before turning to the registration requirement and the residency requirement. The Court determines that the five-circulator limitation and the registration requirement both impose a severe burden on speech that is not justified by a compelling state interest. Accordingly, both requirements are unconstitutional in the City of Edinburg. Additionally, the Court finds that, in the absence of the requirement that the petition committee circulate petitions in Edinburg, the Charter does not separately require residency for circulators. As a result, the Court declines to examine the constitutionality of limiting circulation to Edinburg residents.

### 1. Standard for a First Amendment Claim

There is considerable tension in the realm of elections and political speech between private rights and government regulation. The Supreme Court has recognized that petition circulation "is 'core political speech' because it involves 'interactive communication concerning political

change.'" *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)). "First Amendment protection for such interaction . . . is 'at its zenith.'" *Id.* (quoting *Meyer*, 486 U.S. at 425). In spite of, or perhaps because of, the importance of First Amendment rights in the voting context, the Supreme Court has also noted that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

"Most constitutional analyses of a statute begin with an examination of the degree of scrutiny a statute will receive." *Voting for America, Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012). There are many different levels of scrutiny, and election regulations have historically warranted a "more flexible standard" than strict or intermediate scrutiny, as courts recognize the need for governments to implement rules for conducting fair and efficient elections. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). Courts considering an election law's constitutionality must weigh "the character and magnitude of the asserted injury" to First Amendment rights against "the precise interests put forward by the State as justifications for the burden." *Anderson*, 460 U.S. at 789. The Supreme Court has also characterized this inquiry as asking whether "the restrictions in question significantly inhibit communication with voters about proposed political change [] and are not warranted by the state interests . . . alleged to justify those restrictions." *Buckley*, 525 U.S. at 192. There is "no litmus-paper test for separating those restrictions that are valid from those that are invidious," and there "is no substitute for the hard judgments that must be made." *Storer*, 415 U.S. at 730.

Ultimately, the additional flexibility given to governments in the election context may not be separate from strict scrutiny but rather may be a function of the strong interests local and state

governments have in regulating elections. The modern Supreme Court elections decisions are "in keeping with the 'now-settled approach' that state regulations 'impos[ing] "severe burdens" on speech . . . [must] be narrowly tailored to serve a compelling state interest.'" *Buckley*, 525 U.S. at 192 n.12 (quoting *id.* at 206 (Thomas, J. concurring)) (alterations in original).

With this background, it is important to recognize that in the post-*Buckley* precedent, many circuits apply strict scrutiny without qualification to regulations on petition circulation, primarily due to its status as "core political speech." *See Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316–17 (4th Cir. 2013) ("[A] consensus has emerged that petitioning restrictions like the [witness residency] requirement at issue here are subject to strict scrutiny analysis."); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) ("Because the [residency] restriction creates a severe burden on plaintiffs' First Amendment rights, strict scrutiny applies."); *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002) ("[W]e are persuaded [the ordinance limiting petition circulation to city residents] is subject to strict scrutiny."); *Lerman v. Bd. of Elections of New York*, 232 F.3d 135, 146 (2d Cir. 2000) (holding that a requirement that petition signatures be witnessed by a resident "clearly [regulated] core political speech subject to exacting scrutiny"). The Fifth Circuit has not had occasion to decide whether strict scrutiny applies. The Court is of the opinion that strict scrutiny is applicable to a regulation of "core political speech" even in the elections context, though it is cognizant of the "more flexible standard" permitted in elections regulation. Therefore the Court will consider whether Plaintiff has shown that Edinburg's petition system constitutes a "severe burden" on speech that is not justified by a compelling state interest.

### 2.   The Five-Circulator Limitation

The Court will first address the five-circulator limitation. Plaintiff argues that the five-circulator limitation is a severe burden because it "limit[s] political speech" and that it is not justified by any permissible compelling interest. (Dkt. No. 28 at 10). Defendants, for their part,

only argue that the five-circulator limitation is not a severe burden on speech, protecting it from constitutional scrutiny. (Dkt. No. 32 at 3).

Defendants claim that because Plaintiff succeeded at collecting the requisite number of signatures, "Plaintiff cannot show that the 'five person' requirement has 'significantly inhibit[ed] communication with voters about proposed political change' and therefore, that the five-person requirement is a 'severe burden.'" *Id.* (quoting *Buckley*, 525 U.S. at 192 & n.12). Defendants add that how many circulators are permitted should not matter for signature-gathering, as "the City of Edinburg Charter does not limit the time period for collecting signatures." *Id.* The Court does not agree that this is a sufficient replacement for permitting more than five circulators, but the issue is moot because Texas law provides that a "petition signature is invalid if the signer signed the petition earlier than the 180th day before the date the petition is filed." Tex. Elec. Code § 277.002(e).

Circulators in Edinburg, therefore, have only 180 days to collect the required number of signatures, which was 804 valid signatures for the 2022 election cycle. (Dkt. No. 28 at 6). The Court acknowledges that this would only require the members of the petition committee to gather 161 signatures each within 180 days, which from the evidence before the Court—namely the fact that the "vast majority of the signatures" were gathered by two of Plaintiff's employees during an approximately 40-day period, (Dkt No. 28, Exh. A at 2)—seems doable.[1] However, this does not take into account the fact that the total signature requirement is a moving target, set at 10% of the voters in the previous municipal election. Edinburg, Tex. Charter, art. XVI, § 1. The Court has noted in hearings that Edinburg is a growing city and should only expect this number to increase. And of course, "[i]n reality, a [petition] needs a surplus of signatures, because they will likely be

---

[1] The Court notes that this was achieved by two paid circulators, whom Plaintiff's executive director states were highly skilled in communication and political organizing. (Dkt. No. 28, Exh. A at 2–3). Naturally, inexperienced and uncompensated individuals would likely be slower to collect signatures, but regardless the Court does not rest its holding on the feasibility of collecting 161 signatures within 180 days.

challenged on any number of grounds, resulting in some, perhaps many, invalidations." *Krislov v. Rednour*, 226 F.3d 851, 859–60 (7th Cir. 2000); *see* Edinburg, Tex. Charter, art. XVI, § 2 (permitting the City Secretary to invalidate defective signatures).

However, this question of whether it is burdensome for any particular individual to gather a certain number of signatures is a red herring. It is irrelevant that, as Defendants argue, an organization like Plaintiff may not find it a substantial burden to find five Edinburg voters who would be willing to circulate the petition and that it would not substantially burden those circulators to collect enough signatures themselves. (Dkt. No. 32 at 3 (noting that Plaintiff succeeded at collecting signatures with only four circulators)).[2] It is not just Plaintiff's or the committee members' speech that is at issue. It is also the speech of all other individuals who are prohibited from speaking on petitions.

Signature-gathering is "core political speech," and Edinburg cannot limit the speech of individuals who wish to gather signatures for a petition simply because there are already five circulators. *Buckley*, 525 U.S. at 186 (citing *Meyer*, 486 U.S. at 422). Defendants' argument presumes that for any given petition, there is only one organization that is "speaking" when signatures are gathered, but this is a misconception. Every individual has a right to speak in support of governmental change, which includes signature-gathering for petitions those individuals had no role in organizing. Edinburg's petition-committee system is not merely a regulation for *how* an organization like Plaintiff may speak; it is instead a regulation for *whom* may speak regarding any particular petition. Such a limitation is a severe burden on nonmembers of the petition committee, as they are forbidden from engaging in "core political speech." It is insufficient that non-circulators have other avenues to support a petition; to deny them the ability to circulate is a regulation of speech that constitutes a "severe burden."

---

[2] Notwithstanding that a restriction can be a substantial burden even if it is still possible to comply with the restriction.

Defendants provide no independent justification for why petition circulators should be limited to five, so the Court does not have a state interest to weigh against the severe burden on nonmembers of the petition committee. Defendants appear to imply that the five-person limitation is helpful alongside the registration requirement as a form of residency verification, but Defendants provide no reason as to why, if the City is capable of verifying registration for hundreds of petition signatories, the City is incapable of verifying registration for more than five petition circulators. (*See* Dkt. No. 32 at 5–6). Therefore, even if this Court were to uphold the registration requirement, the five-circulator limitation must be struck down as a severe burden on speech that is not the least restrictive means to serve a compelling state interest. Regardless, for the reasons that follow, the Court finds Defendants' stated interests insufficient to support limiting petition circulators.

### 3. The Registration Requirement

The Court now turns to the registration requirement in the Edinburg Charter. The City interprets the Charter to require petitions to be circulated by "voters of the city," and it is agreed that this phrase means voters registered in Edinburg. Edinburg, Tex. Charter, art. XVI, § 1.

Plaintiff points to *Buckley* as the controlling case, arguing that "the Supreme Court has held that a petition circulator local voter registration requirement is unconstitutional." (Dkt. No. 34 at 1 (citing *Buckley*, 525 U.S. at 186)). Defendants attempt to deflect the application of *Buckley* through their characterization of Edinburg's system as a "residence requirement," though they agree that *Buckley* "struck as unconstitutional the requirement that [Colorado] petition circulators be registered to vote, not the requirement that they be citizens of the state." (Dkt. No. 32 at 3); *Buckley*, 525 U.S. at 197 (refraining from deciding the constitutionality of Colorado's residence requirement because it was not challenged by the plaintiff). Defendants also cite approvingly to *Initiative & Referendum Institute v. Jaeger*, an Eighth Circuit case that upheld a residence requirement in North Dakota. 241 F.3d 614 (8th Cir. 2001).

The Supreme Court in *Buckley* did not expressly hold all registration requirements to be unconstitutional; it instead determined that Colorado's requirement was a significant burden that was "not warranted" by some "impelling cause." *Buckley*, 525 U.S. at 197. The Court considered its decision to be "entirely in keeping with" the strict scrutiny test that "state regulations 'impos[ing] "severe burdens" on speech . . . [must] be narrowly tailored to serve a compelling state interest.'" *Id.* at 192 n.12 (quoting *id.* at 206 (Thomas, J. concurring)) (alterations in original). This Court will therefore analyze Edinburg's registration requirement under this standard.

The initial question is whether requiring petition circulators to be registered Edinburg voters constitutes a "severe burden on speech" because such a regulation decreases the number of people allowed to speak on a particular issue. This question has been answered in the affirmative by the Supreme Court and nearly all Courts of Appeals, generally holding that restrictions like registration and residency requirements are "severe burdens." *See Buckley*, 525 U.S. at 643–44 (holding that the registration requirement "impose[d] a burden on political expression" by limiting petition proponents' ability to convey their message); *We the People PAC v. Bellows*, 40 F.4th 1, 23–23 (1st Cir. 2022) (holding that both state residency and registration requirements would likely "severely burden core political speech"); *Lerman*, 232 F.3d at 146 (holding that a requirement that witnesses to petition signatures be registered in the city "severely burdens political speech"); *Wilmoth v. Secretary of New Jersey*, 731 F. App'x 97, 103 (3d Cir. 2018) ("Because New Jersey's residency requirement for circulators restricts "core political speech," strict scrutiny is warranted."); *Libertarian Party*, 718 F.3d at 317 (approving the "general agreement among [its] sister circuits that residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination"); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013) (permitting a registration requirement for Texas volunteer deputy registrars and contrasting it with petition regulations, noting that

"[p]etitions by themselves are protected speech . . . [and] are the circulator's speech"); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008) (holding as "undisputable" that requiring the plaintiff to "only use circulators who resided in Ohio and were properly registered to vote in Ohio" both "sharply limited [the plaintiff's] ability to convey his message" and "curtailed [the plaintiff's] core political speech"); *Krislov*, 226 F.3d at 860 (holding that a requirement that candidate-petition circulators be registered to vote in the candidate's district was a "formidable burden on the candidates' right to disseminate their message"); *Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (applying strict scrutiny because the voter-registration requirements "at issue in the present case limit the ability of citizens to have initiative petitions circulated"); *Nader v. Brewer*, 531 F.3d at 1036 (holding a state residency requirement to be a "severe burden on plaintiffs' First Amendment rights"); *Chandler*, 292 F.3d at 1243 (holding that a city residency requirement was a "diminution in core political speech" subject to strict scrutiny); *see also Jaeger*, 241 F.3d at 616 (concluding that a residency requirement in North Dakota was constitutional because "the State has a compelling interest in preventing fraud and the regulation does not unduly restrict speech").

The consensus among the courts is clear: when a restriction on petition circulators "limit[s] the number of voices who will convey [the initiative proponents'] message" and, as a result, limits "the size of the audience [proponents can reach]," the restriction is a severe burden on core political speech that may only be justified by a compelling state interest. *Buckley*, 525 U.S. 194–95 (quoting *Meyer*, 486 U.S. at 422–23).

The second question is whether Edinburg's registration requirement is supported by such an interest. Defendants' Motion attempts to justify the registration requirement indirectly. Defendants argue that Edinburg possesses a "compelling state interest" in "ensuring that the proposals for change in the City are brought . . . by fellow residents" because the City "seeks to protect small government and, more specifically, to safeguard its finances, and the City cannot do

that if organizations or residents outside of the City—or State—, seek to increase local government spending, or shift the priorities of the City's budget and projects." (Dkt. No. 32 at 4). Further, the "residence requirement is an additional safeguard for local, grassroots movements, just like the provisions upheld in *Jaeger*" which required both petition circulators and signatories to be voting-eligible North Dakota residents. *Id.*; *Jaeger*, 241 F.3d at 616–17. Defendants then justify the registration requirement as necessary to the residency requirement in that it "ensures or allows the City to confirm that [circulators] are truly Edinburg residents." (Dkt. No. 32 at 5). Defendants fear that there is too much movement of residents in and out of Edinburg for it to properly confirm residency using, for example, a "driver's license, which by law need not be updated in fewer than 180 days." *Id.*

      The Court first notes that the Eighth Circuit in *Jaeger* did not uphold North Dakota's residency requirement as a grassroots safeguard but as a fraud-prevention measure. *Jaeger*, 241 F.3d at 617 (noting the state had raised the grassroots argument but not adopting it). A state's concern about possible fraud is one of the more commonly asserted justifications for residency or registration requirements, though it has not been accepted as sufficient by other circuits and never, to this Court's knowledge, been accepted as sufficient for a *city* registration requirement. *See, e.g.*, *Nader v. Brewer*, 531 F.3d at 1037 (concluding that Arizona "did not meet its burden of showing that [the] residency requirement is narrowly tailored to further the state's compelling interest in preventing fraud"). Regardless, Defendants have only vaguely alleged fraud concerns, so the Court lacks evidence to suggest that petition fraud is a concern in Edinburg that could only be addressed by a registration or residency requirement. (*See* Dkt. No. 32 at 4). Edinburg certainly has an interest in "prevent[ing] fraud and abuse," but the limitation on unregistered residents and nonresidents is so severe that the City's "few tools, mainly, its police power and/or subpoena power" must be shown to be insufficient to prevent fraud before the City may prohibit individual speech. *Id.*

Edinburg already takes one very significant step to prevent fraud. Every petition *signatory* must be a registered voter in Edinburg, and each signatory must include alongside their signature both their address and their birthdate or voter registration number. (Dkt. No. 29, Exh. A and supplements); Edinburg, Tex. Charter, art. XIV, § 1; *id.* art. XVI, § 1. This requirement is unchallenged. The City Secretary has the ability and the responsibility to verify that each petition is signed by the required number of "voters of the city." Edinburg, Tex. Charter, art. XVI, § 2. These are clear measures to prevent signature fraud. Defendants present no justification as to why these steps are inadequate and why prohibiting nonresidents from gathering signatures is necessary. Defendants address this point in their motion, noting this "Court has mentioned requiring all signatories to be voters of the City would protect those interests, but nothing supports finding that this is the *only* way in which the City of Edinburg can, or should, protect its interests." (Dkt. No. 32 at 4). Defendants invert the standard. The registration requirement severely burdens speech and must therefore be justified. If there are potentially other, less restrictive means to accomplish the same end, the City must show that they are inadequate. It has failed to do so. The Court therefore determines that restricting circulators to registered Edinburg voters "cuts down the number of message carriers in the ballot-access arena without [the] impelling cause" of fraud-prevention. *Buckley*, 525 U.S. at 197.

The Court now considers the "grassroots safeguard" argument, finding that Edinburg's alleged justification in limiting petition circulators to city residents in order to exclude the interests and voices of nonresidents is suspect and improper under the First Amendment. The Court raised this concern in its previous Order, noting that it was "not clear at this time, however, that *excluding* the interests of nonresidents is proper." (Dkt. No. 29 at 16).

This point has largely been unaddressed in the current briefing, and the Court has not found precedent supporting the ability of a state or municipality to exclude nonresidents for the express

purpose of suppressing those nonresidents' speech. Instead, the Supreme Court has held that "[i]n the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85 (1978). More recently, the Court has noted that content-based and identity-based restrictions "are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340–41 (2010). This is no different in the election and petition context. *See Krislov*, 226 F.3d at 866 ("To the extent this law is designed to serve a third interest—preventing citizens of other States from having any influence on Illinois elections—we question its legitimacy."). Edinburg's stated interest in isolating city discourse to residents is functionally the same as an interest in preventing the speech of nonresidents. This Court cannot accept that as a "compelling interest" in limiting speech.

The Court stresses that "[e]ncouraging local initiatives and grassroots efforts is certainly a proper interest." (Dkt. No. 29 at 16). Edinburg may devise programs that encourage civic participation among Edinburg residents. What it cannot do is deny nonresidents their First Amendment right to speech, even if that speech is not representative of Edinburg residents. The Court therefore determines that Edinburg's registration requirement is a severe burden on speech that is not justified by a compelling state interest. The requirement is unconstitutional.

### 4. The "Residence Requirement"

Defendants characterize the Edinburg Charter's system as a "residence requirement," with both other requirements flowing from that primary goal. (Dkt. No. 32 at 5). The Court notes, however, that there is no challenge by Plaintiff to a potential residence requirement in the Charter because the Charter does not contain any such requirement. The Charter, as it reads currently, requires a "committee of the petitioner" composed of "voters of the city." Edinburg, Tex. Charter,

art. XVI, § 1. As applied by Defendants, Edinburg's system limiting circulators to five or to registered voters violates the First Amendment. A reading of all Charter provisions discussing circulation reveals that the Charter places no additional requirements on circulators. *See* Edinburg, Tex. Charter, art. XV; *id.* art. XVI.

The Court will not read into the Charter a third, unenumerated requirement that circulators be Edinburg residents. Therefore the Court declines to address the constitutionality of requiring circulators to be city residents. Such a question would involve wading directly into a split among the circuits. *Compare Jaeger*, 241 F.3d at 616 (permitting a residency requirement in North Dakota), *with Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030–31 (10th Cir. 2008) (holding unconstitutional a residency requirement in Oklahoma), *Chandler*, 292 F.3d at 1243–44 (holding unconstitutional a residency requirement in a Colorado city), *and Nader v. Brewer*, 531 F.3d at 1038 (holding unconstitutional a residency requirement in Arizona).

The plain text of the Edinburg Charter did not clearly require Defendants to exclude unregistered or non-members of the petition committee from petition circulation, but because they did so the Court deferred to Defendants' interpretation of the Charter and was required to determine whether that application of the Charter was constitutional. There is no support for Defendants' contention that the Charter requires or even permits the City to exclude nonresidents from circulating petitions. For the foregoing reasons, Edinburg must permit petition circulation by nonresidents.

### D.  The "Appropriation Ordinance" Issue

The last consideration before the Court is whether the petition at issue is prohibited by the Edinburg Charter as an "appropriation ordinance." Edinburg, Tex. Charter, art. XIV, § 1. This is a question of statutory interpretation and state law that the Court resolved in its previous Order. (Dkt. No. 29 at 9–12). A short summary follows.

The Edinburg Charter prohibits "appropriation ordinance[s]" from being submitted to the City for consideration. Edinburg, Tex. Charter, art. XIV, § 1. Defendants contend that Plaintiff's ordinance, which would require the City to "establish a wage floor of $15.00 per hour for City employees and persons paid under City contracts," (Dkt. No. 25, Exh. B § 30.100), and would require the City incorporate the wage floor "into the City of Edinburg budget," *id.* § 30.105, is an "appropriation ordinance." (Dkt. No. 32 at 8). Defendants advocate for a broad reading of the word "appropriation" in the Charter. They suggest that the Charter's description of the "power to propose any ordinance, except an appropriation ordinance or an ordinance making a tax levy" represents the "express object and intent of the voters" in amending the Charter in 1996 "to limit what would be submitted to popular vote: city finances." Edinburg, Tex. Charter, art. XIV, § 1; (Dkt. No. 32 at 8).

The Court holds to its conclusion in its previous Order: that the category of "appropriation ordinance[s] [and] ordinance[s] making a tax levy" does not encompass all ordinances relating to "city finances." This interpretation is supported by the Texas Supreme Court's general practice of interpreting charter provisions "liberally . . . in favor of the power reserved" by the people as well as the historical precedent of *Taxpayers' Association of Harris County v. City of Houston* that this Court cited in its previous Order, where the Texas Supreme Court exempted minimum wage petitions from an "appropriation" rule. *Brown v. Todd*, 53 S.W.3d 297, 303 (Tex. 2001); *Taxpayers' Ass'n of Harris Cnty v. City of Houston*, 105 S.W.2d 655, 657 (Tex. 1937).

Defendants argue the Houston Charter in *Taxpayers* is distinguishable from Edinburg's, claiming that the *Taxpayers* charter was "the citizenry's straightforward, unconditional reservation of a right to direct legislation through initiatives and referendums" while the Edinburg Charter, "as amended by the citizens of the City of Edinburg in 1996, limits the people's power of direct legislation through initiatives by excluding appropriation ordinances." (Dkt. No. 32 at 8). The main

distinction between the charter provisions at issue here and in *Taxpayers* is that the language limiting "appropriations" was approved by the people of Edinburg at the same time as the codification of the initiative process, while it was already present in the Houston Charter when the people of Houston approved the initiative provision. *See Taxpayers*, 105 S.W.2d at 660. Because the people of Edinburg approved the exclusion of appropriation ordinances, Defendants argue, the Court should interpret the phrase broadly instead of following Texas Supreme Court practice of "liberally constru[ing] [charter provisions] in favor of the power reserved" by the people to initiate ordinances. *Brown*, 53 S.W.3d at 303 (quoting *Taxpayers*, 105 S.W.2d at 657); (Dkt. No. 32 at 8).

The Court does not agree. The key issue is how to interpret the word "appropriation," and it does not follow absent other evidence that the word should be interpreted broadly solely because the limitation was approved by the people of Edinburg. The Court does not believe this one distinction should cause it to reject the historical practice of Texas courts to liberally construe charter provisions in favor of the power reserved to the people.

Defendants suggest that the ban on "appropriation ordinances" must include petitions such as Plaintiff's, as "[i]f ordinances mandating minimum expenditures in City budgets are not excluded, then what would [be]?" (Dkt. No. 32 at 8). The Court believes that the Charter would indeed exclude ordinances mandating minimum expenditures, such as a requirement to spend $5,000,000 each year on local parks. But an ordinance increasing the minimum wage of park employees is not a mandate for minimum expenditures, given that the City remains in control over the number of park employees it retains.

The Texas Supreme Court rejected the idea that the Houston Charter's "Prerequisite to Ordinance[s] Appropriating Money" had any "remote reference to ordinances such as these, which merely express public policy of the city by stipulating minimum salaries for city officers and employees." *Taxpayers*, 105 S.W.2d at 660. Viewing this precedent holistically, this Court

determines that the Edinburg Charter should not be construed broadly to bar any petition regarding city finances. Instead, the Court follows its reasoning in the previous Order, that an "appropriation ordinance" requires some specific allocation of money, rather than any policy changes that may have the effect of requiring the city to adjust its budget.

## IV.    Conclusion

For the foregoing reasons, the Court determines that the City of Edinburg's petition-committee system imposes a severe burden on speech that is not warranted by a compelling governmental interest. Therefore, the two requirements that petitions in Edinburg be circulated by no more than five individuals and that all circulators be registered Edinburg voters are both unconstitutional under the First Amendment. The Court declines to consider the constitutionality of a residency requirement, as it determines that the Edinburg Charter cannot support a requirement that circulators be residents in the absence of the above two requirements.

It is, therefore, **ORDERED** that:

1. Plaintiff's Motion for Summary Judgment is **GRANTED**;

2. Defendants' Motion for Summary Judgment is **DENIED**;

3. The City of Edinburg shall no longer enforce its policy of limiting who may circulate an initiative petition; and

4. The City Secretary shall certify the "Living Wage" petition submitted by Plaintiff and submit the initiated ordinance to the Edinburg City Council.

It is hereby **DECLARED** that the City of Edinburg's policy described in Article XVI, Section 1 of the City of Edinburg Charter and as applied by the City to limit petition circulators to five individuals and to registered Edinburg voters is unconstitutional under the First Amendment to the United States Constitution.

SO ORDERED March 9, 2023, at McAllen, Texas.

Randy Crane
Chief United States District Judge